**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| IN RE: APPLICATION OF ARIEL ADAN | : : : | |
| Petitioner, | : : | **OPINION** |
| v. | : : | Civil Action No. 04-5155 (WHW) |
| ELENA ESTER AVANS, | : : | |
| Respondent. | : : : : | |

**Walls, Senior District Judge**

     This case concerns the petition of Ariel Adan, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501 (1980) ("the Convention") for the return of his child, Arianna, to Argentina.  The petition was granted by this Court on June 15, 2005.  Respondent Elena Ester Avans[1], the mother of the child, appealed.   The Third Circuit remanded, instructing the Court: (1) to determine whether Petitioner retained custody rights under Argentine law such that the child's removal from Argentina was wrongful under the Convention; (2) to make detailed findings of fact on the allegations of abuse and the protective efficacy of the Argentine courts and police; and (3) to determine whether the grave harm exception of the Convention applies.

_____

[1]In her brief, Avans refers to herself as "Elena Ester Mazza."  Because she has not made a motion to amend the official caption of the case to reflect a change in name, we shall refer to her as "Avans" in this opinion.

**NOT FOR PUBLICATION**

**PROCEDURAL HISTORY**

1. <u>The Initial Petition</u>

Adan filed an application with this Court, pursuant to the Convention, in October 2004 seeking the return of his daughter, Arianna, to Argentina.  This Court held a hearing on June 6 and 7, 2005, at which it heard testimony from Avans and Adan.  On June 7, 2005, this Court issued an order granting Adan's petition for the return of the child and ordering Avans to return Arianna to Argentina immediately.  Although it made no formal written findings of fact, the Court concluded that Avans had not demonstrated by clear and convincing evidence that Arianna would be subject to physical or psychological harm if returned to Argentina, as required by the Convention.

2. <u>The Third Circuit's Opinion</u>

Avans filed an immediate appeal to the Third Circuit, which vacated this Court's order and remanded for further proceedings.  Preliminarily, the Third Circuit addressed the issue of whether Petitioner maintained custody of Arianna such that her removal was wrongful under the Convention.  In ruling that this Court erred in finding that Petitioner satisfied his burden of proof as to his custody rights under Argentine law, the Circuit stated:

> we are compelled to vacate [the District Court's] June 7, 2005 order and remand the case for further fact finding to determine: (1) what is the custody law of Argentina; (2) what are the terms of the parties' agreement regarding custody of Arianna; (3) whether that agreement is enforceable under Argentine law; and (4) under the agreement (or, if the agreement is not enforceable, Argentine family law), whether Adan had custody rights or mere rights of access, and whether he was validly exercising those rights at the time Arianna was removed.

<u>In re: Application of Ariel Adan</u>, 437 F.3d 381, 394 (3d Cir. 2006).

NOT FOR PUBLICATION

To make a successful application for the return of a child under the Convention, a petitioner must prove by a preponderance of the evidence that he has valid rights of custody.  If the petitioner satisfies this burden, the burden shifts to the respondent to prove by clear and convincing evidence that the Article 13(b) exception to the Convention applies.  Id. at 394-95; Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995).  Article 13(b) states that the requested state is not bound to return the child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  19 I.L.M. 1501, Art. 13(b) (1980).

The Third Circuit found that the Court erred in its analysis of the alleged grave risk of harm to Arianna and instructed the Court to address those deficiencies on remand if it concluded that Adan had rights of custody under the Convention.  In re: Application of Ariel Adan, 437 F.3d at 397.  Specifically, the Third Circuit instructed the District Court to:

> (1) make detailed, written findings of fact on all allegations of abuse and harm visited upon Avans and Arianna by Adan, and on the protective efficacy of the Argentine courts and police, evaluating the witnesses' complete testimony and all other evidence in the record; (2) consider the totality of the circumstances related to the alleged child abuse rather than explaining away each allegation in isolation; and (3) if the Court decides Avans has not satisfied her burden of proving a grave risk of harm and the inability of Argentine authorities to protect the child, carefully tailor an order to ameliorate, as much as possible, any risk to Arianna's well-being.

Id.

3.  Proceedings on Remand

On May 15, 2006, the parties appeared before the Court to present evidence as to whether

-3-

**NOT FOR PUBLICATION**

Adan retained valid custody rights over his daughter under Argentine law and exercised those

rights such that Avans' removal of the child from Argentina was wrongful under the Convention.

However, at the hearing, it became apparent that the parties were unprepared to present evidence

about Argentine law.  Therefore, the Court adjourned the hearing to September 27, 2006 to allow

the parties to fully brief the issues.  The Court also directed the parties to read Gioampaolo v.

Erneta, 390 F. Supp. 2d 1269, 1279 (N.D. Ga. 2004), a case that addresses rights of custody

under Argentine law.

Both parties submitted trial briefs on September 12, 2006 in anticipation of the upcoming

hearing.  However, on the day of the hearing, Petitioner was unavailable.  The Court rescheduled

the evidentiary hearing to the spring of 2007.

The Court heard evidence on April 11, 12, 16 and 17, 2007.  Petitioner Adan testified on

behalf of himself and presented no other witnesses.  Respondent presented the testimony of three

witnesses: (1) Avans; (2) Jose Maria Vera, a licensed Argentine attorney who presently

represents Avans in the pending civil case in Argentina; and (3) Dr. Susan Borja, psychiatrist at

Trinitas Hospital in Elizabeth, New Jersey who conducted an intake psychiatric evaluation of

Arianna on March 25, 2006.

**THE HAGUE CONVENTION**

The Convention was implemented in the United States in 1988 as the International Child

Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 et seq.  The Convention was created

with the stated purpose "to protect children internationally from the harmful effects of their

-4-

**NOT FOR PUBLICATION**

wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."  Convention, Preamble; <u>Yang v. Tsui</u>, 416 F.3d 199, 201 (3d Cir. 2005).  The goal of the Convention is to restore the status quo ante and to deter parents from forum-shopping internationally to resolve custody disputes in a more sympathetic court.  <u>See In re: Application of Ariel Adan</u>, 437 F.3d at 395.  The United States and Argentina, as signatories to the Convention, are considered "Contracting States."

Pursuant to Article 19 of the Convention and ICARA, 42 U.S.C. § 11601(b)(4), the court's role in applying the Convention is not to resolve the merits of any custody issue.  Rather, the court is to determine whether the child was removed or retained wrongfully from the child's habitual residence.  <u>See</u> <u>Whallon v. Lynn</u>, 230 F.3d 450, 455 (1st Cir. 2000); <u>Friedrich v. Friedrich</u>, 983 F.2d 1396, 1400 (6th Cir. 1993).  The Hague Convention considers the removal or retention of a child to be wrongful when:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention, and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3.

A parent seeking the return of a child bears the burden of establishing wrongful removal or retention by a preponderance of the evidence.  42 U.S.C. § 11603(e)(1)(A).  If the petitioner meets this burden, then the parent opposing the child's return has the burden of establishing by clear and convincing evidence the applicability of one of the exceptions or affirmative defenses

NOT FOR PUBLICATION

provided in Articles 12, 13, or 20 of the Convention.  42 U.S.C. § 11603(e)(2)(A), (B).  Unless

the respondent is successful in raising one of these defenses, the court must order the return of

the wrongfully-removed or retained child.

**DISCUSSION**

    **A**.  **Status of Adan Under the Convention**

       In order to establish a prima facie case under the Convention, the petitioner must

establish the following by a preponderance of the evidence: (1) the habitual residence of the child

immediately before the date of the alleged wrongful removal or retention was in a foreign

country; (2) the removal or retention is in breach of custody rights under the foreign country's

law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful

retention.  19 I.L.M. 1501, Art. 3 (1980).  Here, the parties do not dispute that Arianna's habitual

residence is Argentina.  The key issue confronting this Court is whether Petitioner retained rights

of custody over Arianna and sufficiently exercised those rights such that Respondent's removal

of Arianna to New Jersey was "wrongful."

    1. <u>Findings of Fact</u>

    Respondent Avans was born in Argentina but moved to the United States as a small child.

She is a naturalized United States citizen.  In 1997, following divorce proceedings with her

former husband, she returned to Argentina.  In 1998, Avans met Respondent Adan, and the

parties began cohabiting shortly thereafter.  Petitioner testified that the parties met at a Narcotics

Anonymous meeting.  Respondent denied having ever used drugs and stated that she merely

**NOT FOR PUBLICATION**

attended meetings with Adan to offer support as he unsuccessfully attempted to stop abusing

cocaine, marijuana, steroids, and alcohol.  Based on the demeanor of the parties and their

testimony, the Court concludes that both parties have abused drugs during their relationship.

In 1999, Avans became pregnant by Adan.  In March 2000, while she was pregnant,

Avans came to the United States and began living in New Jersey.  Adan followed her to New

Jersey in April 2000 and the parties resumed co-habiting.  Avans gave birth to Arianna on June

15, 2000.  The parties lived together in New Jersey for the next three months.  On September 15,

2000, the parties and their daughter returned to Argentina.

In June 2002, while living in Argentina, the parties separated.  On July 8, 2002, the

parties signed an Agreement Regarding Custody, Child Support, and Visitation ("the

Agreement").  The Agreement was prepared jointly by Avans' and Adan's attorneys.  The

Agreement states: "The parties hereby agree that custody of the child will be granted to the

mother, Elena Esther Avans."  The Agreement requires Adan to pay 100 pesos per month in child

support.  The Agreement establishes a visitation schedule whereby the child would visit Adan

every Tuesday, Thursday, and Sunday from 2:00 p.m. to 4:00 p.m.  The Agreement also

describes how the possessions of Adan and Avans were to be divided.  Finally, the Agreement

states that each parent has equal authority to request judicial homologation of the Agreement.

Neither party requested judicial homologation of the Agreement, and the Agreement has

never been confirmed by any Argentine court.  The father made one payment of 100 pesos and

followed the visitation schedule for approximately a month or two.  The physical possessions

were never divided.

**NOT FOR PUBLICATION**

In November, 2002, the parents reconciled and resumed co-habiting.  The parties separated again, for the last time, in June, 2003.  Adan continued to have regular visits with the child.  In December, 2003, Avans went to the family court in San Martin and complained that Adan was harassing her and that she believed he was sexually abusing Arianna.  The Court issued a ninety-day restraining order and set a hearing for March, 2004.   However, on January 28, 2004 Avans brought Arianna to the United States without the consent of Adan.  Avans did not appear at the San Martin hearing.  Adan filed an application in this Court pursuant to the Hague Convention for the return of the child to Argentina on October 21, 2004.

The custody case in San Martin, Argentina is still pending.  Presently, Avans is represented by counsel before that court.  In February 2007, Avans returned to San Martin to appear before that court.  That court's proceedings are stayed pending this Court's determination of Adan's petition for the return of the child to Argentina.

2.  <u>Rights of Custody Under the Convention</u>

Petitioner and Respondent dispute whether Petitioner had rights of custody over the child at the time of her removal from Argentina.  Since both parties agree that the child's habitual residence is Argentina, the law of Argentina governs the Court's analysis.  Article 14 of the Convention permits courts to take judicial notice of the law of the country of habitual residence in determining whether there has been a wrongful removal.  <u>Baxter v. Baxter</u>, 423 F.3d 363, 370 n.14 (3d Cir. 2005).  Specifically, Article 14 reads:

In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested

NOT FOR PUBLICATION

> State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

See Convention, Art. 14; see also Feder, 63 F.3d at 225 (taking judicial notice of Australian family law to determine whether father had rights of custody under the Convention); Whallon, 230 F.3d at 455 (analyzing provisions of Mexican law in light of the Convention's basic principles in order to determine whether parent had rights of custody).  Article 7 of the Convention authorizes Central Authorities "to provide information of a general character as to the law of their State in connection with the application of the Convention."[2]  Convention, Art. 7.

Additionally, Fed. R. Civ. P. 44.1 provides a framework for the Court to determine the law of foreign jurisdictions.  The rule provides that:

> In determining foreign law, [a court] may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination shall be treated as a ruling on the law.

Fed. R. Civ. R. 44.1.  The rule gives courts broad authority to conduct their own independent research.  Bel-Ray Co., Inc. v. Chemrite Ltd., 181 F.3d 435, 440 (3d Cir. 1999).  Courts may also rely on submissions from the parties concerning foreign law.  Nat'l Group for Comm'ns and Computers Ltd. v. Lucent Technologies Int'l, 331 F.Supp.2d 290, 294 (D.N.J. 2004).  Courts may seek the aid of expert witnesses in arriving at legal conclusions.  Id.  However, courts are not

---

[2]  "A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities."  Convention, Art. 6.

NOT FOR PUBLICATION

bound by the determinations of experts and may "reject even the uncontradicted conclusions of

an expert witness and reach their own decisions on the basis of independent examination of

foreign legal authorities."  Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.

1980).  Where an expert applies the law to a set of facts and draws legal conclusions, the court

may admit the report to assist it in making a substantive determination of foreign law.  ID

Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.,198 F.Supp.2d 598, 623. (E.D. Pa. 2002).

However, the report must be disallowed to the extent that it seeks to guide the court in

determining the facts of the case.  Id.; see also Lithuanian Commerce Corp. v. Sara Lee Hosiery,

177 F.R.D. 245, 246 (D.N.J. 1997), vacated in part by, Lithuanian Commerce Corp., Ltd. v. Sara

Lee Hosiery, 179 F.R.D. 450 (D.N.J. 1998).

    In determining rights of custody under the Convention, courts have relied on expert

testimony regarding foreign law, code provisions, affidavits, and letters from experts.  In

Giampaolo, for example, the district court relied on letters from the Argentine Central Authority

as well as the Argentine Civil Code in determining petitioner's custody rights under Argentine

law.  390 F.Supp.2d 1269.  Similarly, in Whallon, the court looked to the Mexican Civil Code as

well as an affidavit of a Mexican attorney to determine whether petitioner had rights of custody

within the meaning of the Convention.  230 F.3d at 458.  As such, the Court considers any

material submitted by the parties, the testimony of witnesses, and the Court's own research in

making a determination as to whether Adan was exercising rights of custody within the meaning

of the Convention.

    Petitioner did not call any live witnesses to testify about Argentine law, but submitted to

-10-

**NOT FOR PUBLICATION**

the Court: (1) information from the Central Authority of Argentina, known as Ministerio de

Relaciones Exteriores, Comercio Internacional y Culto; (2) a declaration from the Family Court

Judge Raul Oscar Belgrano, in San Martin, Argentina which discusses Argentina's child custody

laws; and (3) an expert report by Dr. Pablo Lopez Ruf[3] which explains the applicable child

custody law in Argentina.  Dr. Ruf's report is supplemented by a letter from Dr. Ruf to the Court

on February 5, 2007.

Respondent called Dr. Jose Maria Vera, an Argentine lawyer, to testify regarding

Argentine law.  Respondent also submitted an expert report prepared by Dr. Vera interpreting

Article 264 of the Civil Code and Argentine family law.  The Court notes that Dr. Vera is Avans'

attorney in her pending custody case in Argentina and the inherent potential for bias that this

relationship creates.

The Court has also reviewed relevant sections of the Argentine Civil Code and directed

specific questions to the Argentine embassy in Washington D.C., which answers aid this Court's

understanding of the relevant law.

3. *Patria Potestas*

The Argentine Civil Code provides:

*Patria Potestas* denotes the set of rights and duties belonging to the parents in
respect to the person and property of their children, for their protection and
integral education, from the moment of their conception and while under age and

---

[3]Dr. Ruf is a legal advisor of Lopez, Ruf & Associates with 30 years of experience.  He
has been a Professor of Civil Rights and Interpretive Conceptions in the School of Law of
Buenos Aires University (UBA) since 1984.

NOT FOR PUBLICATION

not emancipated.

Argentine Civil Code, Art. 264.  Particularly relevant is the provision for unwed parents who co-habit: "In the case of children born out of wedlock and acknowledged by both parents, *patria potestas* belongs to both parents if there was cohabitation."  Under Article 264, express consent of both parents is required for authorization to leave the country.  The letter from Dr. Belgrano further explains that where a parent has *patria potestas*, he has legal custody as defined by Article 5, Section A of the Convention and "the person that retains his child without the authorization of the other parent or of a court would be wrongfully retaining the minor in the terms of Art. 3 of the Hague Convention."

> 4.  <u>The Agreement</u>

The parties do not dispute that Petitioner had *patria potestas* at one time.  Rather, the key issue before the Court is whether Petitioner gave up this right when he signed the Agreement on July 8, 2002 and granted "tenencia" (physical custody) to Avans.[4]   According to Petitioner's expert, Dr. Ruf, the Agreement is unenforceable because: (1) it was never judicially approved; and (2) it became void when the parties reconciled.  In contrast, Respondent's expert, Dr. Vera, testified that the Agreement remains valid and binding because it has never been modified by the

---

[4] As previously discussed, the Agreement was signed by Avans and Adan on July 8, 2002. Both parties were represented by attorneys.  The Agreement states that "tenencia" (physical custody) of the child is granted to the mother, Elena Esther Avans.  The Agreement established a visitation schedule for Arianna to visit her father every Tuesday, Thursday, and Sunday from 2:00 p.m. to 4:00 p.m.  The Agreement ordered Adan to pay child support in the amount of 100 pesos each month and granted Avans possession of the assets of the marital home.  Additionally each party had equal authority to request judicial "homologation" of the agreement.

**NOT FOR PUBLICATION**

parties.

The report by Dr. Ruf states that the Agreement became inoperative when the parties reconciled and resumed co-habitation after the execution of the agreement.  Dr. Ruf directs the court to Section 234 of the Argentine Civil Code which provides: "The action for legal separation or absolute divorce shall be concluded and all its effects terminated upon the spouses' reconciliation after occurrence of the facts giving grounds thereof.  Reconciliation shall relate to the spouses' relationship before the complaint."  Dr. Ruf opines that since the parties resumed co-habitation following the execution of the Agreement, the custody rights of Arianna reverted to the conditions before the Agreement.  Dr. Ruf cites an Argentine case, <u>P.,M. et al v. R.,M.A. on Custody</u>, March 8, 1990, for the proposition that the provision extends by analogy to common law marriages and custody of minors.

In contrast, Respondent's expert, Dr. Jose Maria Vera, testified that the Agreement is completely valid even though it has not been judicially ratified.  According to Dr. Vera, the Agreement gave Avans sole custody and is valid unless the parties modify it by a later agreement.

To resolve these discrepancies, the Court undertook independent research of Argentine law and contacted the Argentine Embassy in Washington D.C.  The Court sent a letter to the Embassy, in which it gave a general factual background of the case, without identifying the parties, and posed the following legal questions:

1) Under Argentine law, can a father contractually give up his rights of <u>patria potestas</u> in an Agreement?

-13-

**NOT FOR PUBLICATION**

2) Is a custody agreement that has not been homologated or judicially approved enforceable under Argentine law?

3) If such agreement is enforceable, what is the effect if the unmarried parties later reconcile and  resume co-habiting?  What is the effect if the parties once again separate?

4) In light of the facts described above, is the Agreement enforceable under Argentine law?

5) Based on the answer to question 4, what custody rights does the father currently have under Argentine law?

In a letter dated April 25, 2007, the Embassy forwarded responses from the Department of Legal Affairs of the Argentine Republic in Argentina to the Court.  The Department of Legal Affairs informed the Court that under Argentine Law, a father cannot give up his rights of *patria potestas* through an agreement.  Under Article 306 of the Civil Code, *patria potestas* only ends by death, by profession of the child or parents in monastic institutions, by the children coming of age, by legal emancipation, or by adoption.  A parent can also be deprived of *patria potestas* by the court if a parent is found guilty of an offense against the minor.  Civil Code, Art. 307.  The Department of Legal Affairs further informed the Court that an agreement that has not been judicially "homologated" is invalid because it "lacks the power of execution."

Having considered the expert reports and testimony, the Argentine Civil Code, and the responses from the Argentine Department of Legal Affairs, the Court concludes that the Agreement is unenforceable under Argentine law because a father cannot contract away his rights of *patria potestas* and furthermore, because the Agreement was never "homologated".

### 5.  Rights of Custody

Because Petitioner did not give up *patria potestas*, the Court finds that he had "rights of

-14-

**NOT FOR PUBLICATION**

custody" as conceived under the Hague Convention.  See Giampaolo, 390 F.Supp.2d at 1279 (concluding that where a father maintained *patria potestas* under Argentine law, he had "rights of custody" within the meaning of the convention); see also Whallon, 230 F.3d at 458 (finding that a petitioner had rights of custody over a child pursuant to Mexico's legal concept of *patria potestas*); In re Cabrera, 323 F.Supp.2d 1301, 1311 (S.D. Fla. 2004) (finding that a petitioner had rights of custody over a child pursuant to Argentina's legal concept of *patria potestas*); Mendez Lynch v. Mendez Lynch, 220 F.Supp.2d 1347, 1358 (M.D. Fla. 2002) (same).

Finally, the Court concludes that Petitioner was exercising his custody rights at the time of the child's removal from Argentina to the United States.  "[I]n the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child."  In re Cabrera, 323 F. Supp.2d at 1312 (citing Mendez Lynch, 220 F.Supp.2d at 1359).

Petitioner co-habited with Respondent and lived with Arianna during much of her childhood in Argentina.  When the parties were separated, Petitioner maintained regular visitation hours with her.  When the child was removed from Argentina, Petitioner made attempts to locate the child.   It can hardly be stated that Petitioner did not seek to maintain contact with the child so as to exercise his rights of custody.  The Court finds, by a preponderance of the evidence, that Petitioner retained rights of custody and was exercising these rights at the time of the child's removal from Argentina.   Accordingly, Petitioner had status to file a petition under the Convention.

6. Wrongful Removal

-15-

NOT FOR PUBLICATION

Since Petitioner retained *patria potestas* over the child with Respondent, his express consent was necessary to remove the child from Argentina.  Argentine Civil Code, Art. 264.  The evidence demonstrates that Respondent removed the child from Argentina without Petitioner's permission or consent.  Inasmuch as Petitioner never provided his authorization for the child to change her place of residence and inasmuch as the child's removal effectively precluded Petitioner from caring for the child and making decisions regarding the child's welfare and upbringing, the child's removal from Argentina was in breach of Petitioner's "rights of custody" under the Convention.

### B.  Grave Harm Exception

Since Petitioner has adequately demonstrated that he retained rights of custody over his child and exercised those rights such that Respondent's removal of the child from her country of habitual residence was wrongful, the burden shifts to Respondent to prove by clear and convincing evidence that the Article 13(b) exception to the Convention applies.  In re: Application of Ariel Adan  437 F.3d at 394-95; Feder, 63 F.3d at 222.  Here, Respondent asserts the "grave risk of harm" exception.

Article 13(b) of the Convention provides that a court, in its discretion, need not return a child to her country of habitual residence if the opposing party "establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Convention, Art 13(b); Hague Convention Analysis, 51 Fed. Reg. at 10,510.  The Article 13(b) exception is narrowly drawn.  See In re Application of Ariel Adan, 437 F.3d at 396; Feder, 63 F.3d at 226.  The U.S. State Department has explained

-16-

**NOT FOR PUBLICATION**

that the exception is not meant to encompass a situation where the child would return to a

country where financial resources or educational opportunities are more limited than in the

United States.  Rather, an example of an intolerable situation is one in which a custodial parent

sexually abuses a child.  The Hague Convention analysis states:

> If the other parent removes or retains the child to safeguard it against further
> victimization, and the abusive parent petitions for the child's return under the
> Convention, the court may deny the petition.  Such action would protect the child
> from being returned to an 'intolerable situation' and subjected to grave risk of
> psychological harm.

Hague Convention Analysis, 51 Fed. Reg. at 10,510; In re Application of Ariel Adan, 437

F.3d at 395; Baxter, 423 F.3d at 737.

The grave harm exception has been held to apply in two sets of cases: (1) when the return

of the child puts the child in imminent danger such as returning the child to a zone of war,

famine, or disease; and (2) in cases of serious abuse, neglect or emotional dependence, where the

court in the country of habitual residence is incapable or unwilling to give the child adequate

protection.  Baxter, 423 F.3d at 373 (citing Friedrich, 78 F.3d at 1069).  If the alleged grave risk

of harm is abuse, the party opposing the application of the Convention bears the burden of

proving by clear and convincing evidence that the return of the child to her habitual residence

puts her in imminent danger and that the country of habitual residence is incapable or unwilling

to give the child adequate protection.  Baxter, 423 F.3d at 373 (citing Friedrich, 78 F.3d at 1069);

In re Application of Ariel Adan, 437 F.3d at 395.

Only evidence that directly establishes the existence of a grave risk of harm to the child is

material to the Court's determination.  51 Fed. Reg. at 10510.  Article 14 of the Convention

**NOT FOR PUBLICATION**

authorizes the Court to take into account information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.  Convention, Art. 14.   Additionally, in evaluating abuse, the Court must consider the totality of the circumstances.  In re Application of Ariel Adan, 437 F.3d at 397.

        1.  Testimony Regarding Grave Harm

Avans testified that in March 1999, four months after the parties moved in together, Adan became abusive.  According to Avans, Adan would yell, scream, and shove her.  Avans testified that when she told Adan that she was going to leave him, he locked her in the bedroom with him and begged her to give him a second chance.  Ultimately, the parties separated in March 1999.

The parties reunited on September 21, 1999, and Avans became pregnant with Arianna.  Avans testified that the abuse resumed.  Specifically, Avans testified that Adan forcibly took off her clothes, tried to choke her, forced her head under water in a kiddie pool, and then locked her in the backyard.  This sequence of events allegedly took place in front of Adan's twelve-year-old son, Arnold.

Avans testified that she convinced Adan that it would be a good idea for her to come to the United States to have the baby.  On February 4, 2000, Avans traveled to New Jersey.  After initially living with her brother, she got a job in Hillside as a receptionist and began renting an apartment in Roselle.  In April, Adan arrived unannounced at Avans' brother's house.  Avans testified that she allowed Adan to live with her because he threatened to hurt the child if she did not stay with him.  The child was born on June 15, 2000.  Avans testified that the abuse resumed.

**NOT FOR PUBLICATION**

She described one incident in which Adan threw her on the bed and "suffocated" her with a pillow.  Avans testified that she filed a police report but did not request a restraining order.  Avans described another incident in which Adan became angry because Avans would not promise to return to Argentina with him.  According to Avans, Adan knelt next to Arianna's bassinet and began screaming in Arianna's ear so that Avans would agree to return to Argentina.  Avans testified that she ran to the police station to get help.  Avans did not submit any police reports into evidence.[5]

Avans continued to live in New Jersey with Adan until September 2000 when the couple returned to Argentina together.  Avans testified that she moved back to Argentina out of fear that Adan would hurt the child if she did not.  The parties lived together in Argentina between September 2000 and March 2002.  Avans testified that the abuse continued.  In particular, she described an incident in March 2002 in which Adan pulled out a gun in the car and pointed it at Avans and Arianna, threatening to kill them both.

Between March 2002 and November 2002, the parties lived apart.  Avans and Arianna moved in with Avans' mother and then with her cousin.  The parties signed the Agreement in July 2002 which set out a visitation schedule for Adan.   Avans testified that during this time period, Adan would show up at Avans' house and harass her.  In November 2002, Avans again

---

[5]Counsel for Avans attempted to submit photocopies of documents which had not been properly authenticated in accordance with the Federal Rules of Civil Procedure.  The Court advised the parties that all evidence must comply with the Federal Rules.  Since counsel elected not to comply with the Rules, the Court was unable to review and consider whatever police reports may exist.

**NOT FOR PUBLICATION**

returned to Adan.  She testified that her reason for returning to him was that she did not want to put her cousin through the ordeal of having Adan show up uninvited and make a scene.

In June 2003, Avans traveled with Arianna to the United States to attend her son's graduation from high school.[6]  She then returned to Argentina.  Avans testified that she returned because Adan had threatened to come to United States and kill her and Arianna if she did not.  In June, Avans was working and Adan was staying home with Arianna.  Avans testified that one day when she came home from work, she discovered a pubic hair on Arianna's vagina.  When she showed Adan, he became angry and blamed it on a dirty bed.  The next day, Avans left Adan and went to live with her mother.

Avans testified about additional events that led her to believe that Adan was sexually abusing Arianna.  She testified that when the parties had lived apart in 2002 and Adan had visitation rights, Arianna had come home with wet hair and told Avans that she had taken a bath with her father.  Avans also claims that three-year-old Arianna said, "my daddy loves me with his tongue."  When asked about this, Arianna grabbed her mother's face and tried to stick her tongue in Avans' mouth.  On one occasion, Arianna told her mother that her father was putting "something hot in her butt."  Respondent also submitted into evidence a photograph of Arianna, taken by Adan, which shows the child in her bathing suit, with underwear on her head.

The final piece of evidence offered by Avans to support her claim that Adan was sexually abusing the child is the expert testimony of Dr. Susan Borjas of Trinitas Hospital.  Dr. Borjas

---

[6]Avans had a son living in the United States from her previous marriage.

**NOT FOR PUBLICATION**

conducted an initial evaluation of five-year old Arianna on March 25, 2006 at the request of

Avans.  She indicated that Avans told her that Arianna had been exhibiting sexual and aggressive

behavior at school.[7]  Dr. Borjas referred Arianna to follow-up with outpatient services at

Children's Mobile Services.  However, when expressly asked if she believed Arianna had been

sexually abused, Dr. Borjas was unable to offer a professional opinion.  She indicated that further

study would be necessary.

After the parties separated in June, Adan continued to visit with Arianna.  According to

Avans, there were several additional incidents in which Adan was abusive to Avans.  She

testified that on one occasion, he raped her in front of Arianna.  In December 2003, Avans went

to family court in San Martin and complained that Adan was harassing her with verbal violence

and that she feared he was sexually abusing her daughter.  The Court issued a ninety-day

restraining order on December 26, 2003.  Avans maintains that Adan came over to her house on

December 29, 2003, in violation of the restraining order, and beat her.  Shortly before a

scheduled hearing in the Argentine court, Avans brought Arianna to the United States.  The

Argentina case is still active and pending, awaiting the determination of the petition by this

Court.

Adan denied having ever abused Arianna and testified that he loves her very much.

2.  Findings of Fact

In accordance with the Convention, the Court makes findings of fact regarding grave

_____

[7]Avans did not introduce any reports from the school into evidence or call any school
personnel to testify as to Arianna's behavior at school.

NOT FOR PUBLICATION

harm under the clear and convincing standard of proof.  42 U.S.C. § 11603(e)(2)(A), (B).   The

function of any standard of proof is to "instruct the factfinder concerning the degree of

confidence our society thinks he should have in the correctness of factual conclusions for a

particular type of adjudication."  797 F. Supp. 253, 255 (S.D.N.Y 1992) (quoting In re Winship,

397 U.S. 358, 390 (1979) (Harlan, J., concurring).  Clear and convincing proof is an intermediate

standard of proof that is more than the "preponderance of the evidence" standard used in most

civil cases and less than the "beyond a reasonable doubt" standard used in criminal cases.  See

Addington v. Texas, 441 U.S. 418, 423-24 (1979).   "Clear and convincing evidence" should

produce in the fact finder a firm belief or conviction as to the truth of the allegations sought to be

established.  Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 892 A.2d 1240 (2006).

    The Court finds that Avans was the subject of domestic abuse from time to time by the

Petitioner and that what she alleges, in the main, is plausible.  The Court concludes that Adan

was overly possessive and attempted to exercise control over Avans.  At times, he resorted to

using force.  However, the Court does not accept Avans' allegations wholesale and does not find

that the abuse was chronic and pervasive.  Having listened to her on the stand and watched her

demeanor on two separate occasions, the earlier court appearance in June 2005 and the present

one, the Court finds that Avans has exaggerated and embellished the abuse in order to prevail in

court and shelter under the Convention's exception.  As example, Avans makes far greater

allegations of abuse by Adan now than in her earlier June 2005 testimony without any

explanation why she omitted such earlier – with the same opportunity to do so.  This Court is not

clearly convinced of the believability of such "latter" allegations.  The Court finds that Avans has

**NOT FOR PUBLICATION**

returned to Adan on at least three different occasions over the course of their relationship.

The Court recognizes that people, particularly women, who are abused are often hesitant to leave their abuser as a result of love, dependency, fear, or any combination thereof.  In the American law system, the battered wife syndrome is such a principal recognition.  That an abused person does not leave, however, can also indicate that the alleged abuse was not as bad as the person claims.  Here, Avans had no obligation to leave the United States and return to Argentina with Adan.  Unlike Adan, she was an American citizen, who had spent the vast majority of her life in the United States.  She had family and a job in the United States, and was not economically dependent on Adan.  Again, having watched and listened to her in Court, her mannerisms, in not only what was said but in how it was said, convince this finder of fact that she exaggerated many times in attempt to make her legal point.  Hearing and seeing words come from a witness's mouth is more telling of that person's credibility than the often sterile words of a transcript.

Generally, the Court accepts the thrust of Avans' testimony that: (1) she found a pubic hair on Arianna; (2) Arianna came home from her father's house with wet hair after bathing with him; (3) Arianna told her that her father loves her with his tongue; and (4) Arianna told her that her father put "something hot in her butt."  However, considering the evidence both qualitatively and quantitatively, cumulatively and separately, and examining the total circumstances of the relationship of the parents and child, the Court does not find that such evidence proves by clear and convincing evidence that the child was being sexually abused by her father.

There is no evidence that the pubic hair came from Adan.  It is entirely probable that it

**NOT FOR PUBLICATION**

came from a dirty bed, shared by the parties, as Adan claimed.  Nor can the court determine what "something hot in her butt" means if the three-year-old said that.  This Court questions the precise articulation of a child not older than three years old as related by her mother.  The Court is not clearly convinced that these incidents, related by Avans, prove that the father did something untoward.  There was no testimony that the child was bruised in the genital area or buttocks.  There was no testimony that three-year-old child was ever medically examined following Avans' discovery of the pubic hair or Arianna's statement that her father put "something hot in her butt."  There is no history of the mother taking the child to any doctor, medical facility, or police facility  in Argentina.  And there is no evidence, direct or circumstantial, that she did not have the opportunity to do so.  Apparently the first time that Avans sought medical treatment for Arianna was when they came to this country in 2004.  Furthermore, despite having taken Arianna to a psychiatrist for treatment here, Respondent has not offered an expert opinion that the child was abused.  Respondent did not have Arianna appear, either in open court or *in camera*.

Considering the totality of the circumstances, including the abusive relationship between Adan and Avans, the Court concludes that Respondent has not produced clear and convincing evidence, as required by the Convention, that Arianna was sexually abused by Adan.  Respondent has not met her burden to establish the applicability of the grave harm exception to the Convention.

       3.  <u>Protective Efficacy of Argentine Courts and Police</u>

In addition to failing to meet her burden with respect to the alleged sexual abuse,

NOT FOR PUBLICATION

Respondent failed to set forth clear and convincing evidence that the Argentine authorities are

unable or unwilling to protect her and her child.

In determining whether the grave harm exception applies, the court must "take into

account any ameliorative measures (by the parents and by the authorities of the state having

jurisdiction over the question of custody) that can reduce whatever risk might otherwise be

associated with a child's repatriation."  In re Application of Ariel Adan, 437 F.3d at 395 (quoting

Blondin, 189 F.3d at 248).  Courts in the country from which the child is abducted are frequently

as willing and able as the United States to protect children, Friedrich, 78 F.3d at 1068, and

district courts must consider the "range of remedies that allow *both* the return of the children to

their home country *and* their protection from harm, pending a custody award."  Blondin, 189

F.3d at 249 (remanding the denial of a petition under the grave harm exception so that the district

court could consider if a temporary third party placement would protect the child while allowing

him to be returned to his habitual residence).  The Second Circuit has indicated that it is

appropriate for a district court to make inquiries of the government of the habitual state regarding

ameliorative placement options.  Id.  Courts have also relied on individual psychiatric evaluations

in concluding that there are some cases in which return to the habitual residence will result in

severe psychological harm to the child, regardless of how carefully managed by the court system.

See Blondin v. Dubois, 78 F.Supp.2d 283 (S.D.N.Y. 2000) (on remand); see also Danaipour v.

McLarey, 386 F.3d 289 (1st Cir. 2004).

Petitioner has presented evidence that if the child is returned to Argentina, the courts

there will make the same efforts as American courts to protect the child.  There is an on-going

-25-

**NOT FOR PUBLICATION**

civil custody matter in the family court in San Martin that has been stayed pending the resolution of this petition.  Dr. Belgrano, the family court judge in San Martin, explained in a letter dated March 26, 2006, that when the child returns to the country, the court will put together a team of a psychiatrist, psychologist, and social workers to evaluate the child and ensure her health and mental well being.  The team will study the capacity and fitness of Adan to have custody of the child.  The Court does not find that any court in this country could or would do more.

A more recent letter, dated February 27, 2007, from Dr. Laura Martini Inurrutegi, Director of the Office of the Public Defender of Children and Adolescents of San Martin, confirms that upon arrival, Arianna will be met by Children Services at the airport and taken in a Social Services car to the Family Court for the Judicial District of San Martin, where proceedings will take place.  Children Services will provide a psychologist and social worker to ensure the well being of the child.

Respondent challenged the protective efficacy of the Argentine courts by arguing that the Courts are corrupt and that judges are regularly bribed.  Avans testified that when she reported to the police that Adan had broken the restraining order, they did nothing.  Avans testified that Adan told her that he had bribed judges in the past when his former wife had filed complaints against him.  Her attorney, Dr. Vera, testified that corruption is a noted problem in Argentina and pointed to news articles detailing the corruption of several judges.  However, when specifically asked whether there were allegations that Dr. Belgrano, the family court judge in San Martin who will hear this custody dispute, or any judge who has heard the parties' case was corrupt, Dr. Vera answered no.  Similarly, Avans did not allege that Avans had bribed Dr. Belgrano in the past.

**NOT FOR PUBLICATION**

This Court does not find that the Argentine legal system is incapable of resolving a custody dispute and ensuring the well-being and safety of the child of two Argentine citizens based on generalized allegations of corruption in the Argentine judicial system. To the contrary, this Court is confident that the Argentinean courts will more than adequately resolve the interests of the parties and their child. One reading news stories in this country about corruption of individual public officials, including judges, could conclude that our legal system has its shortcomings. No specific evidence has been presented to suggest that the proceeding which will take place in San Martin, in front of Judge Belgrano, will be anything other than fair and appropriate. Furthermore, Judge Belgrano has made clear that Arianna will not be returned to Adan but will become a ward of the state until a full hearing can take place to ensure the well-being of Arianna. Respondent has not demonstrated by clear and convincing evidence that the Argentine courts will be ineffective in protecting Arianna.

**CONCLUSION**

Petitioner Adan's petition for the return of Arianna Adan to Argentina, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, is granted.

The parties are directed to appear on July 19, 2007 at 11:00 a.m. to discuss and finalize plans for the appropriate transport of Arianna to Buenos Aires by either of her parents, the exact date of departure, the airline flight, the time of departure, and the scheduled arrival in Buenos Aires, the cost to be born by Ariel Adan. We do this in order that the Argentine authorities may be promptly notified of the travel arrangements so that they may meet the child at the airport.

              s/William H. Walls

              **William H. Walls, U.S.S.J.**

**NOT FOR PUBLICATION**